Hope v. Hope.

4-9310

236 S. W. 2d 572

Opinion delivered February 5, 1951.

Rehearing denied March 12, 1951.

*C. T. Cotham* and *Lee Miles,* for appellant.

*Henry M. Britt* and *Mallory & Rasmussen,* for appellee.

GRIFFIN SMITH, Chief Justice.  Our decision turns primarily upon the effect to be given a deed executed March 9, 1926, by which James Hope and his wife, Lillie, conveyed to Community Bank & Trust Company two tracts of land for the benefit of William Thomas Hope, their insane son; but, in determining the purpose of this conveyance, it is necessary to say whether the lands were ancestral estates or new acquisitions by the afflicted son. Other points of controversy involve the attempt of William's parents to reacquire the property after their son died in 1936 (a) by inheritance if the estate were ancestral, and (b) by virtue of a probate court order of 1937 purporting to vest title in these claimants, supported by a quitclaim deed executed by a special commissioner for Community Bank long after that institution failed.  Also involved are pleas of adverse possession, limitation of actions, estoppel, laches, and claims of third parties who contend they were innocent purchasers, etc.

William Thomas Hope joined the army before the United States became a participant in World War I in 1917.  He was honorably discharged Dec. 27, 1917, under a finding of chronic dementia, and was entitled to compensation on the basis of total disability—$100 per month at that time.

James Hope was appointed guardian of the person and curator of the estate of his insane son.  At a time not designated the ward's monthly compensation was increased to $125.  There is testimony that the first payments to the guardian represented accumulations, one check being for $2,000, the other for $700.

The Jones 120-acre tract was sold to James Hope April 15, 1924.  Marshall Braughton and his wife sold Hope the Kesler place (160 acres) July 28, 1920.

It is admitted by most of the members of the Hope family who testified, and not denied by any of them, that James—a heavy drinker and at times in trouble with the

law—treated money received from the government as his own and squandered a great deal of it. This came to the attention of officials in the Veterans Bureau and criminal action was considered. The difficulty was compósed when James agreed to resign as his son's guardian and deed to the Community Bank for the ward's benefit the Jones and Kesler places. With the bank's failure in 1931 J. O. Langley was appointed guardian, and when Thomas Hope died Langley was made administrator. Shortly after Langley became administrator James and Lillie Hope (through their attorney, A. T. Davies) filed their petition in probate court asserting that there were no debts against Thomas' estate, and listing the personal property. It consisted of $6,876 in prime securities, $359.54 in cash, and a $3,000 mortgage note. It was represented that the estate consisted of ''certain moneys and property obtained through the U. S. Government'' by reason of services in the army. The land described in the petition included the subject-matter of this litigation. The probate court order was that all real property belonging to the estate of William Thomas Hope, *''now in the possession* of James Hope and Lillie Hope,''* be vested in the petitioners.

An undated petition by Davies for a fee states that he was employed by James Hope, guardian, and that the ward's real property was valued at $15,000. But Davies testified that James Hope had squandered his son's money; and, while Lillie Hope claimed she had paid for the Jones place, and perhaps had put some money in the Kesler farm, she was willing to execute the deed to the Community Bank ''to keep Jim out of the penitentiary.'' Davies was paid $100 for representing James Hope, and represented Mrs. Hope when the estate was ''wound up.''

The Hopes had eight children, six of whom are living. Three have made deeds to their mother conveying any interest they may have had, but the three appellees have retained their shares unless a controlling contention of appellants can be maintained.

In 1924 Joe Hope, son of James and Lillie, was killed while serving as a city fireman in Little Rock. Mrs. Hope

insists that she collected insurance amounting to $4,000. She had forgotten the name of one of the companies. A letter from Aetna Life affirms payment of $2,000 June 5, 1924, but the company's retained records did not show the name of the beneficiary. Police and Firemen's Insurance Association of Indianapolis paid Mrs. Hope $2,000. Her indorsement shows that the check was cashed July 26, 1924. One of the pleadings filed in Mrs. Hope's behalf asserts that between Dec. 27, 1917, and June 26, 1936 (when William died) 222 monthly payments of $25 had been made under § 401 of the War Risk Insurance Act. Although these remittances, says Mrs. Hope, were intended for her benefit, they were received by the guardian and the money was dissipated. It is conceded by Mrs. Hope, however, that she collected this aggregate of $5,550 from her dead son's personal estate, and receipted for it.

While Lillie, Walter, and Glen Hope insist in their brief that the greater portion of money paid on the Kesler place "as [was true] of the Jones tract" was paid over a period of five years, yet Lillie Hope says that she paid the balance of $1,733.33, with accumulated interest. Before Joe's death Lillie had accumulated $250 through peddling, she said. When the checks from Joe's insurance came she deposited them in the Como Bank, "and the same year I used $3,000 on the place Walter [Hope later bought]—the G. T. Jones place." The explanation was that she gave James a check for the $3,000 just mentioned and thought he would take a deed in her name. She sold Walter Hope a part of the realty "and $3,800 was paid cash in hand. The papers were executed by J. R. Lynus—the real estate man who died recently." Mrs. Hope contended that she gave each of the appellees $100 from the proceeds of this sale. Henry Hope flatly denied receiving the money mentioned by his mother, but said his father had seven horses when he died. Six were sold and the proceeds divided. The witness took a mare instead of money.

Henry insisted that in a way he knew his mother was selling timber and some of the land, but she and his

father had always told him and the other appellees that the land itself would be kept for them, hence (inferentially) he supposed she was selling her life interest and did not suspect that warranty deeds in fee were being executed.

James Hope died in 1941 and the widow claimed under the probate court order and the special bank commissioner's deed, hence she took the whole. The year James died he and Lillie sold 40 acres of the Jones tract. After James died Lillie sold the Kesler farm. It was the subject of four transfers before title, *prima facie*, vested in the mother of Lucile Phillips, one of the appellants. The Phillips claim of ownership is by inheritance through her mother.

The Chancellor found that the deed from James and Lillie Hope to Community Bank was intended as payment of money James had squandered; that Lillie's action in joining as a maker was with knowledge of the purpose to be served—restitution. We agree that this determination was correct. The fallacy of appellants' contention that the deed was intended as a mortgage becomes apparent when consideration is given undisputed testimony that when the transaction occurred the guardian's indebtedness was more than $8,000—an amount in excess of what the two farms cost, and there was no suggestion that the appellants be permitted to pay the so-called mortgage. It may be argued that this conduct is consonant with their contention that the estate was not a new acquisition, hence if the deed were not absolute the property would go to the mother or father, Ark. Stat's, § 61-110, and an offer to pay the indebtedness would be an idle gesture.

We quite agree that much of the evidence indicates that Lillie's money possibly paid for the Jones place. There is no one to dispute her testimony that she gave James a check for $3,000 with instructions to have the deed made in her favor. But it is equally certain that she willingly concurred in the suggestion that the two places should be turned over to Community Bank in substitution of the money James had squandered. This she

had a right to do, and in signing the deed she parted with the equitable title she claims, predicated upon issuance of the $3,000 check—a title that in other circumstances she might be able to establish, hence there can be no application of the principle announced in *Roberts* v. *Burgett*, 209 Ark. 536, 191 S. W. 2d 579, or in *Harris* v. *Collins,* 202 Ark. 445, 150 S. W. 2d 749; nor can there be a resulting trust, as contended for by Lillie Hope, when the controlling purpose was to transfer the property absolutely for the benefit of the minor's estate as a means of partial accounting. Under this view the lands were acquired by the afflicted ward and could not be treated as ancestral.

Little need be said concerning the bank commissioner's quitclaim deed. The bank had no interest of its own and could not convey more than it had. Possession under color of title is not a problem, because in the very nature of administration and guardianship here, the insane ward could not be in personal possession. It is true that the property remained on the taxbooks first in James' name and later in Lillie's. But for several years the bank paid taxes from the trust fund long after Thomas died. Of course the guardian's powers terminated with death of the ward. Ark. Stat's, § 57-459.

The petition in probate court not only asserted that there were no debts against the estate, but disclosed substantial personal assets. In these circumstances the administrator did not take possession of the realty; on the contrary, it vested at once in the parents for life, with remainder in fee to the six brothers and sisters, subject' to the probate court's right of divestiture if it should be shown that the administrator's report was incorrect, and in fact there were debts that could not be paid from the personal property. *Pfaff, Administrator,* v. *Heizman, ante* p. 201, 235 S. W. 2d 551.

The decree is lengthy, covering all of the rights found by the Chancellor to have the necessary factual and legal support. Since the decree will be of record in the county where the real property lies and where the several judgments must be enforced, it is not necessary

to detail specific findings, none being incorrect when the prinicipal issues are disposed of.

Affirmed.